IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


CHARLES BREEDLOVE                                        PLAINTIFF


            v.                        CIVIL NO. 21-3054


KILOLO KIJAKAZI, Acting Commissioner
Social Security Administration                          DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Charles Breedlove, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.      Procedural Background:**

Plaintiff protectively filed his current applications for DIB and SSI on February 7, 2019, alleging an inability to work since December 6, 2018, due to a back injury, heart problems and fluid around his heart. (Tr. 100, 263). An administrative telephonic hearing was held on September 30, 2020, at which Plaintiff appeared with counsel and testified. (Tr. 29-53).

1

By written decision dated October 15, 2020, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 13). Specifically, the ALJ found Plaintiff had the following severe impairments: hypertension; coronary artery disease status post myocardial infarction, status post PTCA of right coronary artery; and spondylosis of the lumbar spine. However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 14).  The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> [P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except can occasionally bend, stoop or squat.

(Tr. 14-). With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a cashier, a mail clerk, a production assembler, and a fast-food worker. (Tr. 21).

Plaintiff then requested a review of the hearing decision by the Appeals Council, who, after reviewing evidence submitted by Plaintiff, denied his request on May 3, 2021. (Tr. 1-5). Subsequently, Plaintiff filed this action.  (ECF No. 2). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation.  (ECF Nos. 16, 21).

The Court has reviewed the entire transcript.  The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

## II.   Evidence Presented:

At the time of the telephonic administrative hearing held before the ALJ on September 30, 2020, Plaintiff, who was fifty-one years of age, testified that he obtained a tenth-grade education. (Tr. 34). Plaintiff's past relevant work consists of work as a house mover helper, a sander, a tire

repairer/automobile service station mechanic, a bagger, a lubrication servicer, and tree cutter. (Tr. 50-51).

The pertinent medical evidence for the time period in question reflects the following. On December 18, 2018, Plaintiff was admitted into Baxter Regional Medical Center due to chest pain. (Tr. 406-417, 459-508, 627-655, 893-900, 1150-1289, 1299-1458). Plaintiff reported his chest pain was intermittent but aggravated by exertion. Dr. Richard Schmidt noted Plaintiff had a history of coronary artery disease. Treatment notes indicated Plaintiff had stents placed in March of 2017 but had not followed up mainly due to the lack of health insurance and financial constraints. Plaintiff indicated he had not been taking his medication for five months due to not having a doctor to prescribe the medication but admitted to taking his wife's metoprolol occasionally. Plaintiff reported that he continued to smoke two packages of cigarettes a day. At the request of Dr. Schmidt, Plaintiff was seen by Dr. Patrick Tobbia for a cardiac consultation which included a heart catheterization that revealed a completely occluded right coronary artery. After an angioplasty of the right coronary right artery failed, Dr. Tobbia recommended aggressive medical management. Dr. Schmidt also recommended that Plaintiff stop smoking and pointed out that if Plaintiff quit smoking, he could afford health insurance. Plaintiff requested patches to help him stop smoking. Plaintiff was discharged on December 20, 2018, with directions to take medication as prescribed; to follow a low sodium diet; to refrain from lifting more than five pounds for one week; to refrain from pushing, pulling or heavy lifting; and to follow up with Dr. Tobbia on December 27th.

On December 27, 2018, Plaintiff was seen by Dr. John Edavettal, of the Cardiology Clinic, for a follow-up regarding his coronary artery disease. (Tr. 403-405, 890-892). Treatment notes indicated Plaintiff was seen in March of 2017 for a revascularization of the right coronary artery and had not followed up until he was admitted into the hospital with an occlusion of the right

coronary artery on December 18th. Dr. Edavettal noted that revascularization on December 18th, was unsuccessful. Plaintiff denied any chest pain, shortness of breath, palpitations, edema, dizziness, syncope, depression, or anxiety. Plaintiff admitted to experiencing fatigue and some weakness in his lower extremities. Dr. Edavettal noted Plaintiff was trying to stop smoking. Upon examination, Dr. Edavettal noted Plaintiff exhibited normal carotid upstroke and volume, a heart with regular rhythm and rate, clear lungs to auscultation bilaterally, normal musculoskeletal range of motion, and no edema. Dr. Edavettal continued Plaintiff on his medication regimen and encouraged a cardiac prudent diet and smoking cessation. Dr. Edavettal opined Plaintiff might need to find a less strenuous job.

On January 23, 2019, Plaintiff was seen by Derainey R. Smith, APRN, for a hospital follow-up. (Tr. 862-864, 876-878). Plaintiff reported he had a heart attack and that his right side was completely blocked. Plaintiff also reported neck to low back pain and requested to see a specialist. Upon examination, Nurse Smith noted Plaintiff appeared to be in no acute distress. Plaintiff's heart had a regular rate and rhythm. Plaintiff had a full range of motion in his neck but had decreased back range of motion in all directions. Nurse Smith referred Plaintiff for a MRI of the spine. Plaintiff was instructed to go to the emergency room if he developed chest pain, shortness of breath or dizziness.

On February 27, 2019, Plaintiff was seen by Nurse Smith to obtain a referral to Dr. Bradley, to have papers completed for disability, and to request something to help with his nerves regarding his upcoming MRI. (Tr. 860-861, 874-875) Upon examination, Nurse Smith noted Plaintiff appeared to be in no acute distress. Plaintiff's heart had a regular rate and rhythm. Plaintiff exhibited full range of motion in his neck but decreased back range of motion in all directions. Plaintiff was diagnosed with claustrophobia, back pain, neck pain and coronary artery disease in a

native artery. Plaintiff was given a Lorazepam tablet to be taken thirty minutes before the MRI. Nurse Smith indicated Plaintiff was to return as needed.

On March 4, 2019, Plaintiff underwent a MRI of the lumbar spine that revealed degenerative disc and facet changes with no significant spinal or foraminal stenosis. (Tr. 514-517, 558-559). A thoracic spine MRI revealed an increased kyphosis due to an old mild wedge compressions at T6, T7 and T8; atrophy of the thoracic spinal cord at the site of greatest kyphosis at T6-7; and a small syrinx from the T6-7 level upward for about 3.2 cm. (Tr. 554-555). A cervical spine MRI revealed a concentric disc bulge with posterior broad-based disc herniation at L4-5 with a ventral impression on the thecal sac but no significant spinal stenosis; and disc bulge changes at L4-5 together with bilateral mild facet degenerative change at L4-5 with some narrowing of the lateral recesses bilaterally, greater on the right, which may cause some compression on the L5 nerve root. (Tr. 556-557).

On March 28, 2019, Plaintiff was seen by James Cureington, R.N.P., for a follow-up regarding his coronary artery disease. (Tr. 400-402, 887). Nurse Cureington noted Plaintiff had a failed attempted stenting and continued to have shortness of breath with exertion, as well as occasional numbness in his arms and fatigability. Upon examination, Nurse Cureington noted Plaintiff's heart had a regular rhythm and no murmurs, rubs or thrills. Plaintiff's extremities had no peripheral clubbing, cyanosis or edema. After checking with Dr. Edavettal, Nurse Cureington referred Plaintiff to see cardiology at Barnes-Jewish to evaluate for possible intervention of the right coronary artery. Plaintiff was instructed to follow up with his primary care provider for his arm numbness.

On April 22, 2019, Plaintiff was admitted into Barnes-Jewish Hospital to undergo stenting of his coronary artery. (Tr. 387-394, 437-446). Dr. Eze Okeagu II, noted a successful recanalization

of a chronic totally occluded and distal right coronary artery. Plaintiff tolerated the procedure well and was discharged on April 23, 2019.

On April 24, 2019, Dr. Edavettal noted that he received a call from Dr. Lasala at Barnes-Jewish regarding Plaintiff. (Tr. 399, 886). Dr. Lasala reported Plaintiff was found to have a chronic total occlusion of the right coronary artery that was able to be opened. Plaintiff was noted to have very small vessel disease downstream and continued to have refractory chest discomfort. Dr. Lasala was hopeful that the revascularization would possibly help with Plaintiff's symptoms.

On April 25, 2019, Plaintiff was seen in the emergency room of Baxter Regional Medical Center for groin pain. (Tr. 526-533, 661-664). Assessment notes indicated Plaintiff underwent an angiogram with cardiac stent placement the previous Monday, and now had groin pain and swelling. Upon examination, Dr. Dana L. Kinney noted Plaintiff had bruising and swelling of the right groin and mild swelling and bruising of the left groin. Plaintiff exhibited normal musculoskeletal range of motion and strength and exhibited an appropriate mood and affect. Plaintiff underwent a Doppler study that revealed no evidence of pseudoaneurysm or thrombosis. Plaintiff was discharged and instructed to follow up with Nurse Smith as needed.

On June 3, 2019, Plaintiff underwent electromyography (EMG) and nerve conduction studies (NCS) that revealed a moderate median N compromise at the wrist on the right involving demyelination of sensory and motor fibers. (Tr. 583-588, 666-672, 1898-1903).

On June 10, 2019, Plaintiff was seen for a follow-up appointment following EMG/NCS testing. (Tr. 543-545, 1895-1897). Brandi Anderson, APRN, noted Plaintiff's complaints of leg and arm weakness and pain. Nurse Anderson noted prior imaging did not reveal anything that was surgically amendable. After examining Plaintiff, Nurse Anderson assessed Plaintiff with carpal

tunnel syndrome and back pain. Plaintiff was referred to an orthopedic doctor for his carpal tunnel syndrome.

On June 11, 2019, Plaintiff was seen by Dr. Benjamin Stevens to establish care. (Tr. 561-562). Plaintiff was noted as a smoker and indicated he was interested in smoking cessation. Dr. Stevens noted Plaintiff had stents placed in April, and that Plaintiff indicated he felt good and denied chest pain. Plaintiff reported he did fatigue easily. Dr. Stevens noted Plaintiff was mainly having issues related depression. Plaintiff reported that due to his myocardial infarctions and back pain, he was having a hard time dealing with things. Plaintiff was uncertain if he wanted to take medication or go to therapy. Dr. Stevens assessed Plaintiff with coronary artery disease, tobacco use, and major depressive disorder. Dr. Stevens started Plaintiff on Wellbutrin to help with the smoking cessation and depression.

On July 4, 2019, Dr. Kristin Jarrard, a non-examining medical consultant, completed a RFC assessment opining that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds; could stand and/or walk for a total of six hours; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; could occasionally stoop and crouch; and that manipulative, visual, communicative and environmental limitations were not evident. (Tr. 105-107). On September 3, 2019, after reviewing and discussing additional medical records, Dr. Elizabeth Berry affirmed Dr. Jarrard's opinion. (Tr. 132-135).

On July 9, 2019, Plaintiff was seen by Dr. Stevens for a follow-up for his coronary artery disease, depression, and tobacco use. (Tr. 563-566, 958-961). Plaintiff reported he was down to one-third of a package of cigarettes a day. Plaintiff denied side effects caused by the Wellbutrin and thought it was starting to help. Plaintiff was open to the idea of trying a medication for his

depression. Dr. Stevens noted Plaintiff had recently quit working due to his medical condition and pain which had increased his stress and anxiety. Plaintiff denied chest pain. Plaintiff's physical exam was unremarkable. Dr. Stevens diagnosed Plaintiff with tobacco use and a mild episode of major depressive disorder and added Lexapro to his medication regimen.

On July 15, 2019, Plaintiff was seen by Dr. Russ B. Rauls for left and right hand paresthesia. (Tr. 579-580, 675). Plaintiff complained of numbness and tingling, clumsiness when handling objects, and occasional numbness when using his hands repetitively. Dr. Rauls noted nerve conduction studies showed moderate right carpal tunnel syndrome. After examining Plaintiff, Dr. Rauls recommended a right carpal tunnel release.

On July 18, 2019, Plaintiff underwent a right carpal tunnel release performed by Dr. Rauls. (Tr. 577-578). Plaintiff tolerated the procedure well and was scheduled for a follow-up appointment in two weeks.

On July 31, 2019, Plaintiff was seen by Dr. Rauls for a follow-up status post carpal tunnel surgery. (Tr. 575-576). Treatment notes indicate Plaintiff was two weeks status post right carpal tunnel surgery. Plaintiff reported the numbness and tingly stopped after surgery. Plaintiff reported minimal pain. Dr. Rauls noted the incision was healing well. Dr. Rauls recommended Plaintiff continue to use a brace for two to three weeks during activity, and to follow up as needed and when ready to schedule the left carpal tunnel release.

On August 17, 2019, Plaintiff was seen in the Baxter Regional Medical Center emergency room after falling through the floor of a mobile home he was tearing down. (Tr. 676-680, 1028-1032). Plaintiff cut his right forearm on glass. Plaintiff reported he did not hit his head or lose consciousness and denied any other injuries. Plaintiff was diagnosed with an arm laceration that was sutured and prescribed medication.

On August 19, 2019, Plaintiff was seen by Dr. Ira Chatman for an initial patient evaluation for neck, shoulder, and back pain. (Tr. 1013-1022). Upon examination, Dr. Chatman noted Plaintiff was alert and oriented and was in mild distress. Plaintiff exhibited limitations with active range of motion in his neck. Plaintiff's heart had a regular rate and rhythm and there were no signs of pedal edema. Plaintiff's cervical spine was stiff but there were no palpable trigger points. Plaintiff exhibited tenderness in the thoracic paraspinal muscles and Dr. Chatman noted evidence of crepitation laxity. Dr. Chatman noted no palpable trigger points in the lower back. Plaintiff had a normal gait and was able to do a heel walk and toe walk. Plaintiff had 5/5 strength in his lower extremities. Plaintiff was diagnosed with chronic pain syndrome and prescribed medication.

On August 21, 2019, Plaintiff was seen by Dr. Stevens for a follow-up for his depression, hypertension, and tobacco use. (Tr. 954-957).  Dr. Stevens also noted Plaintiff had been in the emergency department four days ago due to a severe cut on his right forearm. Plaintiff believed the Wellbutrin was helping with his smoking cessation efforts. Plaintiff also believed medication was helping with his depression as he did not have depressive symptoms and felt much better. Dr. Stevens noted, with the exception of Plaintiff's right upper extremity being in a sling, Plaintiff had routine physical examination findings.

On September 17, 2019, Plaintiff was seen by Dr. Chatman for a one-month follow-up appointment to evaluate his response to the medication trial. (Tr. 1003-1010). Plaintiff reported that his hydrocodone dosage had not been effective and admitted to self-escalating the medications which caused him to run out two weeks early.  Dr. Chatman counseled Plaintiff on taking the medication as prescribed. Plaintiff also consented to try injections.

On October 29, 2019, Plaintiff was seen by Dr. Chatman for persistent pain in his middle and lower back. (Tr. 994-1002). Dr. Chatman noted Plaintiff was out of medication due to missing

his injection appointment. Plaintiff indicated he was able to perform activities of daily living for short periods of time. Plaintiff agreed to reschedule his injection appointment.

On November 25, 2019, Plaintiff was seen by Dr. Stevens for a follow-up for his hypertension, tobacco use, depression, and back and leg pain. (Tr. 951-953). Dr. Stevens noted Plaintiff's hypertension and depression were controlled. Plaintiff had also reduced his smoking. Plaintiff complained of back and leg pain and requested injections. Upon examination, Dr. Stevens noted normal cardiovascular, pulmonary, abdominal, psychological and musculoskeletal exams. Dr. Stevens assessed Plaintiff with hypertension, controlled; tobacco use; chronic back pain; and recurrent depression, controlled. Dr. Stevens recommended Plaintiff try a TENS unit for his back pain and that he follow-up at the pain clinic regarding injections. Plaintiff was advised to take Tylenol and Ibuprofen as needed for pain.

On December 13, 2019, Plaintiff was seen by Amanda Martin, APRN, for an evaluation of his swollen feet. (Tr. 948-959). Plaintiff reported he had been sitting with a friend who had a stroke for the past month which required him to sit twelve hours straight. Plaintiff reported elevating his lower extremities helped with the swelling. Nurse Martin noted Plaintiff had long-standing hypertension which remained well controlled with medication. Plaintiff indicated he was trying to stop smoking with Wellbutrin. Plaintiff denied anxiety or depression. Plaintiff was prescribed Lasix and instructed to restrict his salt intake and to increase walking and his water intake.

On December 20, 2019, Plaintiff was seen by Nurse Martin for a one-week follow-up for lower extremity edema. (Tr. 945-947). Plaintiff indicated he started Lasix the previous day. Plaintiff reported he had been unable to pick up the medication or compression socks until the previous day, but already noticed a big difference with his edema. Plaintiff reported his legs and

feet no longer felt tight. Plaintiff also requested a referral to physical therapy for his back pain. Plaintiff was to return in six weeks for an evaluation.

On January 2, 2020, Plaintiff was seen by Dr. Ira Chatman to undergo a lumbar epidural steroid injection. (Tr. 985-989). Dr. Chatman noted after more conservative measures failed to relieve Plaintiff's back pain, he wished to undergo an epidural injection. Treatment notes indicated the procedure occurred without complications.

On January 15, 2020, Plaintiff was seen by Amanda Whitaker, APRN, to discuss his left-sided back pain. (Tr. 941-944). Nurse Whitaker noted Plaintiff complained of chronic low back pain with bilateral lower extremity sciatica since an injury that occurred around 1992. Plaintiff reported he was planning to start physical therapy the following week. Plaintiff also complained of peripheral edema that began when he was sitting with a friend who had a stroke. Plaintiff reported that he helped take care of this friend which required him to sit for about twelve hours straight each day. Nurse Whitaker noted Plaintiff had been prescribed Lasix and was instructed to use compression socks and to reduce his salt intake while increasing his water intake. Plaintiff denied chest pain, lower extremity pain, or shortness of breath. Plaintiff noted improvement with the edema once he started medication and wore the compression socks. A depression screen revealed Plaintiff had minimal depression. Nurse Whitaker noted Plaintiff continued to smoke daily. Upon examination, Nurse Whitaker noted Plaintiff exhibited tenderness to palpation over the lumbo-sacral spine and paraspinal muscles, bilaterally. Plaintiff also had limited range of motion due to pain. Plaintiff was assessed with lumbago with sciatica, other chronic pain, lumbar paraspinal muscle spasm and peripheral edema. Nurse Whitaker encouraged Plaintiff to keep his upcoming appointment with Dr. Chatman and referred Plaintiff to physical therapy. Plaintiff was

also prescribed medication and encouraged to use a heating pad and to do his gentle range of motion exercises.

On January 20, 2020, Plaintiff underwent a physical therapy evaluation for his low back pain. (Tr. 1043-1045). Plaintiff reported experiencing occasional leg spasms throughout the day that might require him to just lay down on the floor. Plaintiff reported sitting in a car or chair more than five minutes or standing more than thirty minutes increased his pain. Plaintiff indicated that he was periodically unable to play with his grandchildren due to pain. It was recommended that Plaintiff attend therapy for six weeks.

On January 29, 2020, Plaintiff was seen by Dr. Ira Chatman to undergo a lumbar medial branch block. (Tr. 980-984). The procedure occurred without complication.

On February 5, 2020, Plaintiff was seen by Nurse Whitaker for a six-week follow-up appointment to assess his left-sided back pain and muscle spasm. (Tr. 938-940). Nurse Whitaker noted she had referred Plaintiff to physical therapy and that Plaintiff reported after two visits that he noticed reduced pain. Plaintiff reported medication had also helped to reduce his symptoms. Upon examination, Nurse Whitaker noted Plaintiff's heart had a regular rate and rhythm with no heaves, lifts or gallops; that Plaintiff exhibited tenderness to palpation over the lumbar-sacral spine, paraspinal muscle spasm on the left and right, and improved range of motion secondary to discomfort; that Plaintiff exhibited a normal gait; and that Plaintiff's cognitive function was intact. Plaintiff was encouraged to continue with conservative treatment to include medication, massage, gentle range of motion exercises and stretching and a TENS unit as directed.

On February 6, 2020, Plaintiff was discharged from physical therapy due to excessive cancellations and no-shows. (Tr. 1046-1047) Aaron Estes, PT, noted Plaintiff was seen for an evaluation and one session due to pain in his low back and legs. Plaintiff then cancelled two

appointments and failed to show up for two appointments which resulted in an automatic discharge from therapy.

On February 12, 2020, Plaintiff was seen by Dr. Ira Chatman to undergo a second lumbar medial branch block. (Tr. 975-979). Dr. Chatman noted Plaintiff reported experiencing at least eighty percent pain relief with the first block. The procedure occurred without complication.

On February 26, 2020, Plaintiff was seen by Dr. Ira Chatman for his chronic pain syndrome. (Tr. 963-971). Plaintiff reported that the block was 80% effective for the first few days, but the pain had returned to pre-injection pain levels. Plaintiff reported a period of time when he was able to do more and to ambulate and rest easier. Plaintiff reported he was able to perform instrumental activities of daily living. Upon examination, Dr. Chatman noted Plaintiff exhibited a stiff cervical spine, tenderness in the thoracic and lumbar spine; a normal memory, affect and mood; a normal gait; the ability to heel and toe walk; and full motor strength in his extremities. Dr. Chatman continued Plaintiff on his medication and recommended a facet rhizotomy.

On March 31, 2020, Plaintiff was seen by Hillary Potter PA-C, for a follow-up appointment status post branch block that Plaintiff indicated was eighty percent effective. (Tr. 1094-1098). Plaintiff complained of persistent pain in his mid-to-lower back and that medication was only partially effective. Plaintiff reported that the branch block helped lower his back pain by more than eighty percent for the first few days, but the pain gradually returned to pre-injections pain levels. PA Potter noted Plaintiff did not bring his medication to the appointment but reported he had enough to last until his refill visit. PA Potter noted Plaintiff had been non-complaint with previous pill counts. Plaintiff reported his current medication was not as effective as his previous regimen of hydrocodone. PA Potter noted the hydrocodone regimen was discontinued due to Plaintiff's

self-escalation due to uncontrolled pain. After discussing the suboxone program, Plaintiff elected to proceed with a trial of buprenorphine therapy with Dr. Chatman.

On April 2, 2020, Plaintiff presented to Dr. Chatman's clinic with the intention of starting the suboxone program for drug dependency and chronic co-morbid pain. (Tr. 1089-1093). Plaintiff reported he last took his medication twenty-four hours before this visit; however, a urinalysis showed no medication and Plaintiff reported no withdrawal symptoms. Plaintiff was cautioned about potential adverse effects if Plaintiff had recent use of opiates. Plaintiff was given an initial dose and monitored for thirty minutes with no side effects noted. Plaintiff was instructed to return in two hours and upon return Dr. Chatman noted Plaintiff had increased withdrawal symptoms. Plaintiff was sent home with enough medication and asked to return the next morning for monitoring.

On April 3, 2020, Dr. Chatman noted Plaintiff presented for day two of his suboxone program for drug dependency and chronic co-morbid pain.  (Tr. 1079-1085). Plaintiff reported he experienced some mild nausea but denied the urge to use and denied the use of any aberrant substance. Plaintiff indicated reasonable control of his pain. Dr. Chatman noted Plaintiff would proceed with the week one trial of buprenorphine.

On April 9, 2020, Dr. Chatman noted Plaintiff presented for his first one-week follow-up after starting the suboxone program for drug dependency and chronic co-morbid pain. (Tr. 1074-1078). Plaintiff reported after initial mild side effects, he was able to continue his self-monitored dose titration but continued to have problems with headaches. After discussing therapy alternatives, Dr. Chatman noted Plaintiff wished to continue with the gradual dose titration. Plaintiff was to return in one week.

On April 17, 2020, Plaintiff was seen by Dr. Chatman for a follow-up for his chronic pain syndrome. (Tr. 1064-1070). Plaintiff reported the medication had been effective, but the taste caused nausea as soon as it touched his tongue. Otherwise, Plaintiff felt he was doing well on his treatment plan. Dr. Chatman indicated he would investigate alternative medication but noted limitations due to Plaintiff's insurance coverage. Dr. Chatman indicated Plaintiff might need to obtain patient assistance to proceed with a different medication. Plaintiff reported that he was able to perform instrumental activities of daily living with minimal pain.

On May 1, 2020, Plaintiff was seen by Dr. Chatman for a two-week follow-up. (Tr. 1058-1060). Plaintiff reported that the smell and taste of his medication made him nauseous. Dr. Chatman recommended a medication change.

On May 21, 2020, Plaintiff was seen by Dr. Chatman for a lumbar medial branch neurotomy. (Tr. 1053-1057). Dr. Chatman noted Plaintiff had undergone two medial branch blocks with at least eighty-percent documented pain relief, as well as the ability to do more with less pain. Due to the response from the blocks, Dr. Chatman recommended Plaintiff proceed with the neurotomy which was performed without complication.

On June 5, 2020, Plaintiff was seen by Dr. Stevens for a six-month follow-up. (Tr. 1102-1104). Dr. Stevens noted Plaintiff had been off his high blood pressure medication for about three months and that Plaintiff wished to resume taking the medication. Plaintiff also reported difficulty falling asleep and wished to resume taking Trazodone, as it had helped in the past.  Plaintiff also had intermittent lift-sided lower rib cage pain relieved with heat. Upon examination, Dr. Stevens noted Plaintiff had mild musculoskeletal tenderness to deep palpation with the lateral inferior rib cage. Plaintiff was prescribed medication and asked to return in six months.

On July 10, 2020, Plaintiff was seen by Dr. Stevens after falling the previous night and muscle spasms in his legs. (Tr. 1100-1101). Plaintiff reported increased lower extremity muscle spasms with numbness and tingling, usually occurring at night. Plaintiff reported he was no longer seeing Dr. Chatman due to financial constraints. Plaintiff reported he was on gabapentin, and hydrocodone at bedtime. Plaintiff reported back injections never really helped with his pain. Upon examination, Dr. Stevens noted Plaintiff had no musculoskeletal pain on palpation. Plaintiff was diagnosed with lumbago with sciatica on the left and right. Dr. Stevens noted he would re-start Plaintiff's gabapentin. Plaintiff was counseled on the importance of smoking cessation.

## III.   Applicable Law:

The Court reviews "the ALJ's decision to deny disability insurance benefits *de novo* to ensure that there was no legal error that the findings of fact are supported by substantial evidence on the record as a whole." *Brown v. Colvin,* 825 F. 3d 936, 939 (8th Cir. 2016). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). The Court must affirm the ALJ's decision if the record contains substantial evidence to support it. *Lawson v. Colvin*, 807 F.3d 962, 964 (8th Cir. 2015).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision.  *Id*.

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental impairment that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520, 416.920.

## IV.    Discussion:

Plaintiff raises several arguments on appeal and are summarized as follows: 1) The ALJ failed to adequately consider the impact of all of Plaintiff's alleged impairments individually and in combination; 2) The ALJ failed to adequately consider and analyze all the evidence as required

and the decision is not supported by the record as a whole; 3) The ALJ's RFC determination is not supported by substantial evidence; and 4) The Social Security Administration's regulations and policies for determining disability are unconstitutionally vague, and result in arbitrary and capricious decisions. (ECF No. 16). Defendant argues the ALJ properly considered all of the evidence and the decision is supported by substantial evidence. (ECF No. 21).

### A.     Plaintiff's Impairments:

Plaintiff argues that the ALJ erred in determining Plaintiff's severe impairments and then failed to consider all of the impairments in combination. (ECF No. 16, p. 2).

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. *See* 20 C.F.R. § 404.1520(c).  While "severity is not an onerous requirement for the claimant to meet…it is also not a toothless standard." *Wright v. Colvin*, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted).  To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. *See* Social Security Ruling 96-3p.  The claimant has the burden of proof of showing he suffers from a medically severe impairment at Step Two. *See Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000).

While the ALJ did not find every medical diagnosis, both before and during the relevant time period, to be a severe impairment, the ALJ specifically and thoroughly discussed the alleged impairments in the decision, and clearly stated that he considered all of Plaintiff's impairments, including the impairments that were found to be non-severe. After reviewing the record as a whole, the Court finds the ALJ did not commit reversible error in setting forth Plaintiff's severe impairments during the relevant time period.

Furthermore, the ALJ's decision clearly states that in determining Plaintiff's RFC, he considered "all of the claimant's impairments, including impairments that are not severe." (Tr. 13). The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (Tr. 14). Such language demonstrates the ALJ considered the combined effect of Plaintiff's impairments. *See Martise v. Astrue*, 641 F.3d 909, 924 (8th Cir. 2011).

**B.      Subjective Complaints and Symptom Evaluation:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id.* As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart,* 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the *Polaski* factors. As discussed in the ALJ's decision, the record revealed that during the relevant time period, Plaintiff was able to take care of his personal needs, to prepare simple meals, to shop for groceries, to pay bills, to help clean house, to help do laundry, to fish, and attend family gatherings. In discussing Plaintiff's activities of daily living, the ALJ also discussed evidence revealing Plaintiff sustained an injury to his arm

in August of 2019, when he was tearing down a mobile home and fell through the floor; and that in December of 2019, Plaintiff had been helping take care of a friend who had a stroke by sitting with this friend, up to twelve hours a day.

With respect to Plaintiff's alleged impairments, the ALJ discussed the record revealing that Plaintiff successfully underwent procedures to revascularize his right coronary artery in 2018, and that subsequent examinations revealed routine cardiac findings. The ALJ also noted Plaintiff's hypertension has stabilized with the use of medication. As for Plaintiff's alleged back impairment, the ALJ acknowledged Plaintiff has complained of back pain; however, the ALJ also pointed to the medical evidence that revealed Plaintiff's reports of experiencing pain relief with injections, medication and therapy. The Court finds, based on the evidence of record, that there is substantial evidence supporting the ALJ's finding that Plaintiff's back impairment was not disabling during the relevant time period. *See Lawrence v. Chater*, 107 F.3d 674, 676 (8th Cir. 1997) (upholding ALJ's determination that claimant was not disabled even though she had in fact sustained a back injury and suffered some degree of pain); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).

Regarding Plaintiff's mental functioning, it is noteworthy that Plaintiff did not allege a disabling mental impairment in his applications for benefits. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001) (failure to allege disabling mental impairment in application is significant, even if evidence of depression is later developed). The record also failed to demonstrate that Plaintiff sought on-going and consistent treatment from a mental health professional during the relevant time period.  *See Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of

evidence of ongoing counseling or psychiatric treatment for depression weighs against plaintiff's claim of disability).

With regard to letters written by Plaintiff's family, the ALJ properly considered this evidence but found it unpersuasive.  This determination was within the ALJ's province.  *See Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019) (ALJ may properly give less weight to lay witness statements that are inconsistent with record).

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he is unable to engage in any gainful activity.  Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

C.      **The ALJ's RFC Determination**:

Plaintiff asserts the ALJ erred by failing to make a function-by-function assessment of his capacity to perform work-related activity; and improperly relied upon the non-examining medical consultants' opinions.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. *Id*.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's

ability to function in the workplace." *Cox. V. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007). However, there is no requirement that an RFC finding be supported by a specific medical opinion. *See Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013) (affirming RFC without medical opinion evidence).

The narrative discussion requirements of SSR 96–8p state: "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8p at 7. The ALJ must also discuss the claimant's ability to perform work activities in an ordinary work setting and to describe the maximum amount of each work-related activity the claimant can perform each day (i.e., 8 hours a day for 5 days a week). *Id.* While there is language in SSR 96–8p that explains the purpose and relevance of doing a function-by-function assessment of a claimant's limitations or restrictions, as long as the ALJ discusses how the evidence supports his conclusion, he has met the requirements of SSR 96–8p.

In determining Plaintiff's RFC, the ALJ considered the medical assessments of the non-examining agency medical consultants, Plaintiff's subjective complaints, and his medical records when he determined Plaintiff could perform light work with limitations.  The ALJ specifically discussed the opinions Drs. Jarrard and Berry. With each opinion, the ALJ stated how persuasive he found the medical opinion and articulated the basis for his finding. The ALJ thoroughly discussed Plaintiff's medical records that consistently reported a heart with regular rhythm and rate; clear lungs to auscultation, bilaterally; a normal gait; the ability to heel and toe walk; full motor strength in all extremities; and normal concentration, mood and judgment. The ALJ also addressed Plaintiff's activities which included his ability to perform household chores; to mow slowly with a push-mower; to shop in stores twice a month for a couple of hours; to spend time

with family at gatherings; to fish; to drive; to lift fifteen to twenty pounds; to break down mobile homes; and to sit with a sick friend for twelve hours a day. While Plaintiff disagrees with the ALJ RFC determination, after reviewing the record as a whole, the Court finds Plaintiff failed to meet his burden of showing a more restrictive RFC. *See Perks v. Astrue*, 687 F. 3d 1086, 1092 (8th Cir. 2012) (burden of persuasion to demonstrate RFC and prove disability remains on claimant). After reviewing the entire transcript, the Court finds substantial evidence supporting the ALJ's RFC determination for the time period in question.

### D.    Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true, and which were supported by the record as a whole. *Goff v. Barnhart,* 421 F.3d 785, 794 (8th Cir. 2005).   Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a cashier, a mail clerk, a production assembler, and a fast-food worker during the time period in question.  *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### E.    Agency's Regulatory Framework:

Finally, Plaintiff argues that the entire disability system is flawed because "the agency's process for determining disability is arbitrary and capricious and such decisions often result in unequal treatment for similarly situated claimants." (ECF No. 16, p. 22). As addressed in *Holman v. Comm'r, Soc. Sec. Admin.,* No. 1:21-CV-01036, 2022 WL 782564, at *6 (W.D. Ark. Mar. 14,

2022), this argument does not warrant remand as the Court's review is restricted jurisdictionally under § 405(g) to "the evidence upon which the findings and decision complained of are based."

**V.    Conclusion:**

Based on the foregoing, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 16th day of June 2022.


/s/     *Christy Comstock*

HON. CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE